IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORY ZIELESCH, | No. 2:11-CV-2242-MCE-CMK-P |
|     Petitioner, | |
|   vs. | FINDINGS AND RECOMMENDATIONS |
| G.D. LEWIS, | |
|     Respondent. | |
| _____ / | |

Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Pending before the court are petitioner's petition for a writ of habeas corpus (Doc. 1), respondent's answer (Doc. 11), and petitioner's reply (Doc. 17). Also before the court is petitioner's motion for an evidentiary hearing (Doc. 18).

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

1

# I. BACKGROUND

A. **Facts**[1]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> On the afternoon of November 17, 2005, Officer Stevens stopped Volarvich on a road outside of Woodland, California. Stevens approached the vehicle, lowered his head towards the driver's side window, and greeted Volarvich with a friendly, "How are you doing today?" Volarvich responded, "Pretty good," then shot Stevens in the face with a Taurus .357 magnum revolver. Death was instantaneous. Stevens collapsed on the side of the road, and Volarvich drove away.
>
> The events that culminated in the murder of Officer Stevens began three days earlier at a motel in Woodland, where Volarvich and his girlfriend, Rebecca Pina, were staying. After a night of using methamphetamine, they failed to check out of the motel at the scheduled time on November 14. Woodland police officers, summoned to evict the holdover tenants, discovered marijuana on Pina and brass knuckles and methamphetamine on Volarvich. The officers arrested Volarvich.
>
> Pina, who had been involved in an intimate relationship with defendant, drove Volarvich's car to defendant's house and asked for help with bail for Volarvich. Defendant reluctantly agreed and ultimately arranged a deal with a local bail bondsman whereby defendant would co-sign for the full amount of the $10,000 bond and pay $300 of the $1,000 bond premium, and Volarvich would pay the remaining $700 after he was released from jail.
>
> When Volarvich was released from jail on November 16, defendant and Pina took Volarvich to defendant's house, where they "got high" on methamphetamine with Lindsey Montgomery, one of Pina's friends.
>
> That afternoon, Volarvich and Pina gave defendant a ride to the Yolo County courthouse, where defendant attended a custody hearing regarding defendant's children with his estranged wife, Michelle. Michelle was living with Doug Shamberger, whom defendant "hated" and considered to be an "asshole." Defendant suspected that both Michelle and Shamberger had burglarized his house; and Shamberger had threatened defendant several times because Michelle paid periodic visits to defendant. In response to these threats, defendant bought a Taurus .357 magnum to protect himself from Shamberger.

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct." Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See id. These facts are, therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be referred to as "defendant."

On the way back to defendant's house following the custody hearing, defendant told Volarvich that he could "take care of" Shamberger as payment for defendant having bailed Volarvich out of jail. When Volarvich remarked that he "needed a piece," defendant replied he "had that taken care of." Volarvich asked: "[D]o you want Michelle done?" Defendant said no. Upon arriving at the house, the threesome again got high, and defendant gave Volarvich the .357 magnum Taurus revolver and $400 to pick up some more methamphetamine in Roseville.

At this point, Volarvich and Pina got into a heated argument. Volarvich called Montgomery, arranged to go to her house, and left defendant's house alone. He then picked up Montgomery and drove to a hotel in Rocklin. En route, Volarvich told Montgomery that defendant had given him a gun because defendant "wanted [Shamberger] taken out." After checking into a hotel room, Volarvich pulled defendant's gun out of a black bag to show Montgomery and started playing with the revolving chamber. Later that night, Volarvich and Montgomery went to Wal-Mart where Volarvich bought a laser sight. Back at the hotel room, Volarvich unsuccessfully attempted to attach the laser sight to the gun with electrical tape. He then tried to Super Glue the laser sight to the gun; this attempt also failed. Because Volarvich was afraid of sleeping past check-out time and being sent back to jail, he and Montgomery stayed up all night.

After leaving the hotel the morning of November 17, Volarvich and Montgomery went to a friend's house and smoked methamphetamine. They then drove back to Montgomery's house in Woodland. As Volarvich drove across the I-5 causeway, he pulled out the gun and started playing with the revolving chamber, spinning the chamber and loading it with bullets. Afraid she would get in trouble because Volarvich was playing with a gun while they drove down the causeway, Montgomery told him to put the gun down. Volarvich complied, placing it on the driver's side floorboard. They smoked more methamphetamine when they arrived at Montgomery's house.

Meanwhile, Pina was still at defendant's house. Furious that Volarvich had not returned with the methamphetamine he was supposed to buy the night before, defendant hit Pina in the head to rouse her from sleep and yelled that, because of her, Volarvich did not come back and that defendant "was out $400 plus the money for the bail bondsman." Unable to connect with Volarvich through his cell phone, Pina called Montgomery, told her that defendant had hit her because Volarvich had not returned, and asked if she had heard from him. Montgomery told Pina that she would "try to get a hold of him." At Montgomery's request, Volarvich called Pina and told her that he was on his way to pick her up.

When Volarvich left Montgomery's house, he was "upset" that defendant had hit Pina. Volarvich brought the gun with him because "he was worried that it was going to be a setup" and he did not want to go back to jail. According to Montgomery, Volarvich believed that either defendant or the bail bondsman was setting him up because he had taken defendant's $400 without returning with the methamphetamine and had not met with the bail bondsman the day before to sigh the bond paperwork.

Apparently on his way to defendant's house to pick up Pina, Volarvich used defendant's .357 magnum revolver to shoot and kill Officer Stevens, after Volarvich was pulled over by Stevens.

3

After the shooting, Volarvich called Montgomery, said that he "fucked up," asked if she could hear sirens, but hung up the phone before explaining further. When Volarvich called Montgomery back, he asked her to pick him up on El Dorado Drive. She agreed, borrowed a friend's car, and found Volarvich standing behind his car holding the license plate. Volarvich and Montgomery then switched cars and drove a short distance to Delta Drive, where they left Volarvich's car and returned to Montgomery's house. On the way to the house, Montgomery noticed that the black bag which had contained the gun was missing. When she asked Volarvich what had happened to it, he explained that he "had to get rid of the gun" and buried it near County Road 96 and County Road 24, which is precisely where the gun was found the next day. Montgomery also overheard Volarvich on the phone telling his mother that he had "shot the cop" but "didn't know if he was serious or not" and thought that "he was just tweaking." Volarvich then called two friends and secured a ride from Woodland to Roseville. During the drive, Volarvich again said he "had shot a cop," and added he did so because "he didn't want to go to jail."

When defendant told Pina an officer had been shot, she turned on the television and saw the news broadcast about the killing. She asked whether he had given Volarvich his gun. Defendant replied that Volarvich's "mentality was there."

Meanwhile, Montgomery received a call from Volarvich telling her to buy window decals to disguise his car. Acceding to Volarvich's request, Montgomery bought decals and window tinting from Wal-Mart, returned to Delta Drive to retrieve the car, and reattached the license plate that Volarvich had apparently removed. After receiving another call from Volarvich informing her where to meet him, Montgomery drove Volarvich's car back to the hotel in Rocklin. There, Volarvich confessed to Montgomery, explaining that when he was pulled over by Officer Stevens, "he just turned and shot him." According to Volarvich, he was "scared" because he "didn't want to go to jail" and believed that being pulled over was part of a set-up orchestrated by the bail bondsman.

Volarvich and Montgomery were arrested at the hotel during the early morning hours of November 18, the same day that defendant was arrested after his house was searched and officers discovered a rifle, methamphetamine, and drug paraphernalia. During questioning, defendant confirmed the antagonistic relationship between himself and Shamberger, and admitted that he had purchased the Taurus .357 magnum revolver in order to protect himself from Shamberger. But he denied asking Volarvich to kill Shamberger and denied giving Volarvich the gun that killed Officer Stevens. According to his version of events, defendant merely showed Volarvich the gun the night before the shooting and discovered that it was missing the next morning.

///

///

///

///

B. **Procedural History**

Petitioner was convicted of the first degree murder of Officer Stevens, conspiracy to commit the murder of Doug Shamberger, five counts of possession of a firearm by a felon, two counts of possession of methamphetamine, and unlawful possession of ammunition. The jury also found true that petitioner was on bail for a pending felony charge at the time of the crimes, and that he was arrested with a firearm during the commission of the crimes. Petitioner was sentenced to 50 years to life, plus seven years, with the possibility of parole. The conviction and sentence were affirmed on direct appeal and the California Supreme Court denied further direct review. A habeas petition filed in the California Supreme Court was denied without comment or citation.

## II. STANDARDS OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998). The AEDPA does not, however, apply in all circumstances. When it is clear that a state court has not reached the merits of a petitioner's claim, because it was not raised in state court or because the court denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal habeas court must review the claim de novo. See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach petitioner's claim under its "re-litigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing petition de novo where state court had issued a ruling on the merits of a related claim, but not the

claim alleged by petitioner). When the state court does not reach the merits of a claim, "concerns about comity and federalism . . . do not exist." Pirtle, 313 F. 3d at 1167.

Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law. Under both standards, "clearly established law" means those holdings of the United States Supreme Court as of the time of the relevant state court decision. See Carey v. Musladin, 549 U.S. 70, 74 (2006) (citing Williams, 529 U.S. at 412). "What matters are the holdings of the Supreme Court, not the holdings of lower federal courts." Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en banc). Supreme Court precedent is not clearly established law, and therefore federal habeas relief is unavailable, unless it "squarely addresses" an issue. See Moses v. Payne, 555 F.3d 742, 753-54 (9th Cir. 2009) (citing Wright v. Van Patten, 552 U.S. 120, 28 S. Ct. 743, 746 (2008)). For federal law to be clearly established, the Supreme Court must provide a "categorical answer" to the question before the state court. See id.; see also Carey, 549 U.S. at 76-77 (holding that a state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice created by state conduct at trial because the Court had never applied the test to spectators' conduct). Circuit court precedent may not be used to fill open questions in the Supreme Court's holdings. See Carey, 549 U.S. at 74.

///

In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards. A state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. See id. at 405. A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases. See id. In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules. Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard. See id. at 406. If a state court decision is "contrary to" clearly established law, it is reviewed to determine first whether it resulted in constitutional error. See Benn v. Lambert, 283 F.3d 1040, 1052 n.6 (9th Cir. 2002). If so, the next question is whether such error was structural, in which case federal habeas relief is warranted. See id. If the error was not structural, the final question is whether the error had a substantial and injurious effect on the verdict, or was harmless. See id.

State court decisions are reviewed under the far more deferential "unreasonable application of" standard where it identifies the correct legal rule from Supreme Court cases, but unreasonably applies the rule to the facts of a particular case. See Wiggins v. Smith, 539 U.S. 510, 520 (2003). While declining to rule on the issue, the Supreme Court in Williams, suggested that federal habeas relief may be available under this standard where the state court either unreasonably extends a legal principle to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. See Williams, 529 U.S. at 408-09. The Supreme Court has, however, made it clear that a state court decision is not an "unreasonable application of" controlling law simply because it is an erroneous or incorrect application of federal law. See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003). An "unreasonable application of" controlling law cannot necessarily be found

even where the federal habeas court concludes that the state court decision is clearly erroneous. See Lockyer, 538 U.S. at 75-76.  This is because "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." Id. at 75. As with state court decisions which are "contrary to" established federal law, where a state court decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless unavailable if the error was non-structural and harmless.  See Benn, 283 F.3d at 1052 n.6.

The "unreasonable application of" standard also applies where the state court denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000).   Such decisions are considered adjudications on the merits and are, therefore, entitled to deference under the AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982. The federal habeas court assumes that state court applied the correct law and analyzes whether the state court's summary denial was based on an objectively unreasonable application of that law.  See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

### III.  DISCUSSION

In his federal petition, petitioner raises the following claims: (1) he is actually innocent; (2) ineffective assistance of trial counsel; (3) Officer Stevens' shooting was not the foreseeable result of any conspiracy; (4) the trial court erred in its ruling regarding immunity for Shamberger after Shamberger asserted his right against self-incrimination; (5) Montgomery's uncorroborated testimony that petitioner gave the gun to Volarvich is insufficient because she was an accomplice; (6) Volarvich's statement that petitioner gave him a gun to use to kill Shamberger was inadmissible hearsay; and (7) the trial court erred in denying petitioner's motion for a new trial based on newly discovered evidence.

/ / /

/ / /

### A. **Actual Innocence**

Petitioner raises a free-standing claim of actual innocence.[2] Except in capital cases, however, the Supreme Court has never recognized such a free-standing claim on federal habeas review. See Herrera v. Collins, 506 U.S. 390 (1993). As recently as 2009, the Supreme Court recognized that it was an "open question" whether free-standing actual innocence claims are cognizable in a non-capital habeas case. District Attorney's Office for Third Judicial District v. Osborne, 129 S.Ct. 2308, 2321 (2009). Given this state of the law, it is impossible to say that the state court's denial of petitioner's free-standing actual innocence claim was either contrary to or an unreasonable application of any clearly established U.S. Supreme Court precedent.

Assuming without deciding that a free-standing actual innocence claim is cognizable, the court finds that petitioner simply has not made a "truly persuasive demonstration of actual innocence." Herrera, 506 U.S. at 417. According to petitioner, he was convicted because Pina lied about her involvement. Petitioner says that Pina was the one who gave the gun to Volarvich and that she lied about the plan to kill Shamberger to point the blame at him. As outlined in the respondent's answer, Pina was subjected to extensive and wide-ranging cross-examination about her credibility and, despite such cross-examination, the jury believed Pina's version of events. The court sees nothing in petitioner's self-serving accusation that Pina lied to compel the conclusion that the jury was wrong in believing Pina. Petitioner's renewed attack on Pina's credibility is certainly not a persuasive demonstration of his innocence.

/ / /

/ / /

/ / /

/ / /

---

[2] Typically, actual innocence is raised in the context of excusing some procedural defect, such as the bar resulting from a state procedural default, which would otherwise preclude federal habeas review. See e.g. Schlup v. Delo, 513 U.S. 298 (1995).

**B.      Ineffective Assistance of Counsel**

The Sixth Amendment guarantees the effective assistance of counsel. The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984). First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. See id. at 688. To this end, petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. See id. at 690. The federal court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. See id. In making this determination, however, there is a strong presumption "that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

Second, a petitioner must affirmatively prove prejudice. See Strickland, 466 U.S. at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.; see also Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000). A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

///

///

///

Petitioner claims that his trial counsel was ineffective in the following ways: (1) for advising him not to testify; (2) for failing to call Rudy Gonzalez as a witness; and (3) for failing to compel the testimony of co-defendant Volarvich.

1. <u>Advice Not to Testify</u>

Petitioner states in the petition that, had he not taken counsel's advice, he would have testified as follows:

> That he bail out Brandt Volarvich out of jail because Rebecca ask him to, that he asked Volarvich to buy some Meth for and gave him the money and ask him to buy some things for the truck, and that Volarvich left alone leaving Rebecca Pina as insurance for Volarvich return and after six hours began calling for Volarvich that could not be reached and started blaming Pina for Volarvich failure to return and at that point notice that the fanny pack with a gun was missing and that both Pina and Volarvich knew of the gun because Petitioner had shown it to them on a previous occasion, when he confronted Pina about the missing gun she stated "I don't have it."
> Petitioner would have told the jury that he never asked Volarvich to kill Doug Shamberger nor did he give Volarvich a gun, he also would told the jury that Pina was lying because she agreed if petitioner bail out Volarvich she would make a sex tape with petitioner.
> Petitioner would have told the jury that he meet and asked Volarvich in the court hallway and told him that he asked Pina to steal the gun for him, and that Volarvich was on his way to shoot petitioner with his own gun because he received a phone call that petitioner had beaten up Pina.

To prevail on his claim of ineffective assistance of counsel, petitioner must show that the outcome of the trial would have been different had the jury heard this testimony. The court finds that he has not made such a showing. The jury heard the story petitioner outlines above in the context of the cross-examination of Pina and, even so, the jury believed Pina's story of what had happened, not petitioner's. The court does not see how the outcome would have been any different had the jury heard petitioner's version of the story from his own mouth, particularly given his own obvious motivation to be less than truthful.

Because petitioner cannot show prejudice, the state court's silent denial of this claim was neither contrary to nor an unreasonable application of the <u>Strickland</u> standard.

///

2. <u>Rudy Gonzalez</u>

Petitioner claims that trial counsel was ineffective for failing to call Rudy Gonzalez as a witness. According to petitioner, Gonzalez made a statement to his trial counsel's investigator in which he related a conversation between petitioner and Volarvich he had overheard. Petitioner does not, however, state that Gonzalez would have actually offered this testimony at trial. Perhaps Gonzalez would have refused to testify. Or perhaps Gonzalez lied to the investigator and his actual trial testimony would have incriminated petitioner. All that petitioner really does at this point is speculate as to what Gonzalez' testimony might have been. It certainly cannot be said that petitioner has established prejudice by demonstrating that a different outcome would have resulted had counsel called Gonzalez as a witness. Because petitioner cannot show prejudice, the state court's silent denial of this claim was neither contrary to nor an unreasonable application of the <u>Strickland</u> standard.

3. <u>Co-Defendant Volarvich</u>

Petitioner claims that his trial counsel was ineffective for failing to obtain Volarvich's testimony that he and petitioner did not conspire to kill Shamberger and that petitioner did not give him a gun. According to petitioner, trial counsel should have issued a subpoena to compel Volarvich to testify on his behalf. As with Gonzalez, petitioner has not shown that Volarvich would have agreed to offer the testimony petitioner outlines. To the contrary, Volarvich would likely have resisted by invoking his Fifth Amendment right against self-incrimination.[3] Given that petitioner fails to show that Volarvich would have testified, he cannot demonstrate that a different result would have been likely had Volarvich in fact testified.

---

[3] The testimony envisioned by petitioner would have been incriminating to Volarvich because, in essence, petitioner would have had Volarvich testify that, though he [Volarvich] killed the police officer, and though someone else gave him [Volarvich] the gun used to kill the police officer, petitioner was in no way involved. Petitioner's envisioned testimony still puts the gun in Volarvich's hand and has Volarvich pulling the trigger.

12

1  Because petitioner cannot show prejudice, the state court's silent denial of this claim was neither
2  contrary to nor an unreasonable application of the Strickland standard.

   **C.    Sufficiency of the Evidence**

   Petitioner claims that the killing of Officer Stevens was not in furtherance of a conspiracy, and that it was unforeseeable.[4] In making this claim, petitioner challenges the sufficiency of the evidence on this point. Petitioner also claims Montgomery's uncorroborated accomplice testimony was insufficient to establish a conspiracy.[5]

   1.    Foreseeability

   When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that, upon the record of evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979).[6] Under Jackson, the court must review the entire record when the sufficiency of the evidence is challenged on habeas. See id. It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id. "The question is not whether we are personally convinced beyond a reasonable doubt. It is whether rational jurors could reach the conclusion that these jurors reached." Roehler v. Borg, 945 F.2d 303, 306

---

[4] Petitioner has not presented clear and convincing evidence that the state court's finding that a conspiracy between petitioner and Volarvich to kill Sharberger did in fact exist should not be accepted by this court.

[5] Petitioner does not argue that Montgomery's testimony was the only factual basis to conclude that a conspiracy to kill Shamberger existed. This makes petitioner's argument somewhat odd given that, even if Montgomery's testimony should have been excluded, this would not be to say that other evidence existed to show a conspiracy.

[6] Even though Jackson was decided before AEDPA's effective date, this expression of the law is valid under AEDPA's standard of federal habeas corpus review. A state court decision denying relief in the face of a record establishing that no rational jury could have found proof of guilt beyond a reasonable doubt would be either contrary to or an unreasonable application of the law as outlined in Jackson. Cf. Bruce v. Terhune, 376 F.3d 950, 959 (9th Cir. 2004) (denying habeas relief on sufficiency of the evidence claim under AEDPA standard of review because a rational jury could make the finding at issue).

13

(9th Cir. 1991); see also Herrera v. Collins, 506 U.S. 390, 401-02 (1993).  The federal habeas court determines sufficiency of the evidence in the context of the substantive elements of the criminal offense, as defined by state law.  See Jackson, 443 U.S. at 324 n.16.

Addressing this claim on direct appeal, the California Court of Appeal stated:

> As he did in the trial court, defendant claims the murder of Officer Stevens "was both unforeseen and unforeseeable."  We conclude the jury's contrary finding is supported by substantial evidence.  The object of the conspiracy between defendant and Volarvich was to end the life of defendant's nemesis with the .357 magnum revolver supplied by defendant for that purpose.  Defendant knew Volarvich had a proclivity for using methamphetamine, having used the drug with Volarvich the night before he gave him the gun to carry out the hit, and having given Volarvich $400 to purchase more methamphetamine.  Defendant admitted knowing Volarvich had an unstable personality; after receiving news of Officer Stevens' murder, defendant told Pina that Volarvich's "mentality was there."  Defendant also had reason to know that Volarvich, who was on searchable probation, would be taken into custody if a law enforcement officer detained him and found the gun.  From these facts, the jury could find that a natural and probable consequence, i.e., a reasonably foreseeable "possible consequence" of the defendant's conspiracy with assassin Volarvich to murder Shamberger . . . was that, if Volarvich were detained by a law enforcement officer before completing the job, Volarvich would kill the officer to avoid arrest and complete his mission to assassinate Shamberger.

Clearly, given the record recited above by the state court, any rational juror could have concluded that Officer Steven's death was a reasonably foreseeable possible consequence of giving a crazed drug user on probation who feared returning to prison a gun with instructions to kill someone.  As the state court observed: "It would be the rare case indeed where a murder is an unforeseeable result of a conspiracy to commit murder."  The state court's denial of this claim was certainly neither contrary to nor an unreasonable application of clearly established law.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

### 2. Montgomery's Testimony

Petitioner argues that Montgomery's uncorroborated accomplice testimony was insufficient to establish the existence of a conspiracy.[7] Assuming that Montgomery's testimony should have been excluded, other evidence was sufficient to show a conspiracy. As the state court noted:

> Pina testified that defendant told Volarvich that Volarvich could "take care of" Shamberger as payment for defendant bailing him out of jail, that Volarvich responded by saying he "needed a piece," and that defendant replied he "had that taken care of." Even defendant's account of events, related to detectives following his arrest, placed him in his bedroom showing Volarvich the gun. Defendant admitted his hatred for Shamberger, a man who was intimately involved with defendant's wife and who, defendant suspected, had conspired with defendant's wife to burglarize his house. Defendant also admitted he purchased the gun to protect himself from Shamberger following several threats, and shortly thereafter, Volarvich left defendant's house with the gun. This evidence – direct evidence of the agreement to kill Shamberger, and circumstantial evidence that defendant supplied the gun in furtherance of the conspiracy – is sufficient. . . .

Absent Montgomery's testimony, any rational juror could have concluded from the evidence outlined above that petitioner conspired with Volarvich to kill Shamberger.

### D. **Immunity**

Petitioner claims the trial court erred by not granting Shamberger immunity after Shamberger asserted his privilege against self-incrimination. While the Sixth Amendment guarantees the right to present the testimony of witnesses and to compel their attendance, if necessary, see Washington v. Texas, 388 U.S. 14, 19 (1967), the right is not absolute, see

---

[7] To the extent petitioner argues that the trial court erred in admitting Montgomery's testimony because it was the uncorroborated testimony from an accomplice, such a claim would not be cognizable on federal habeas review. The application of state laws relating to accomplice evidence is a matter of state law and is not circumscribed by the Fourteenth Amendment, see Lisenba v. People of State of California, 314 U.S. 219, 227 (1941), and claims based on state law are not cognizable under § 2254, see Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).

Chambers v. Mississippi, 410 U.S. 284, 295 (1973).  For example, the Sixth Amendment does not provide a "right to demand use immunity for defense witnesses who invoke their privilege against self-incrimination."  See United States v. Duran, 189 F.3d 1071, 1087 (9th Cir. 1999).  Though never clearly established by the Supreme Court for purposes of review under AEDPA, an exception to this rule has been applied by the Ninth Circuit in the context of a habeas case in the limited situation where the prosecution selectively refuses to grant use immunity.  See Williams v. Woodford, 384 F.3d 567, 600 (9th Cir. 2004).  Such misconduct would occur if the prosecution intentionally caused a defense witness to invoke his Fifth Amendment right, or if the prosecution granted immunity to a government witness in order to obtain that witness' testimony but denied immunity to a defense witness whose testimony would have directly contradicted the government witness.  See id.

    In this case, given that no one was granted immunity, petitioner's claim can only proceed under the first theory of misconduct – that the prosecutor intentionally caused Shamberger to invoke his Fifth Amendment privilege.  The record, however, does not indicate that anything of the sort happened.  While it is true that the prosecution told Shamberger that he would be cross-examined on his relationship with petitioner, his relationship with Pina, and his propensity to lie, such cross-examination would have been proper.  Because the cross-examination described by the prosecutor would have been proper, the court cannot agree with petitioner that Shamberger was intimidated into asserting his Fifth Amendment right.

    Either because the exception recognized in Williams is not clearly established law as defined by the Supreme Court, or because the exception is inapplicable to the facts of this case, the state court's denial of this claim  was neither contrary to nor an unreasonable application of clearly established law.

/ / /

/ / /

/ / /

### E. Hearsay

Petitioner argues that Volarvich's testimony was inadmissible hearsay. Specifically, petitioner claims that the trial court erred in concluding that the testimony constituted an exception to the hearsay rule as Volarvich's statements against his penal interest. It is important to note that petitioner is challenging the state court's application of state evidentiary rules regarding hearsay exceptions and is <u>not</u> arguing that admission of the hearsay violated his rights under the Confrontation Clause.[8] Because petitioner's claim is based on an alleged error in state law, it is not cognizable under § 2254.

### F. Motion for a New Trial

Petitioner claims that the trial court erred in denying his motion for a new trial based on newly discovered evidence. The court agrees with respondent that there is no clearly established United States Supreme Court precedent to support petitioner's claim that the denial of his motion for a new trial resulted in a violation of his right to present evidence in his defense, and petitioner points to no such precedent. Given this state of the law, petitioner is not entitled to federal habeas relief. Additionally, the court agrees with respondent that, to the extent petitioner is challenging the state court's application of state court laws regarding the availability of a new trial, or what constitutes "new evidence," such claims would not be cognizable.

///
///
///
///
///

---

[8] Petitioner's federal petition references an attached brief filed in the state court which at no point presents the argument in the context of a Confrontation Clause violation. Therefore, to the extent petitioner would like to have this court consider whether a Confrontation Clause violation occurred, such a claim would be unexhausted. <u>See</u> <u>Castille v. Peoples</u>, 489 U.S. 346 (1989).

## IV.  CONCLUSION

Because the claims raised in the petition can be resolved on the existing record, petitioner's motion for an evidentiary hearing should be denied.

Based on the foregoing, the undersigned recommends that:

    1.    Petitioner's petition for a writ of habeas corpus (Doc. 1) be denied;

    2.    Petitioner's motion for an evidentiary hearing (Doc. 18) be denied; and

    3.    The Clerk of the Court be directed to enter judgment and close this file.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections. Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  September 13, 2012

                                                          **CRAIG M. KELLISON**
                                                          UNITED STATES MAGISTRATE JUDGE